IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DISTRICT

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal No. 21-00054-RDB |
| MEDARD ULYSSE, | |
| Defendant. | Baltimore, Maryland |
| | March 31, 2021 |

**DETENTION HEARING**

BEFORE: MAGISTRATE JUDGE DEBORAH L. BOARDMAN

APPEARANCES:

MATTHEW MADDOX, ESQ.
Office of the U.S. Attorney
36 S. Charles Street, Suite 400
Baltimore, Maryland 21201
On Behalf of the Government

RICHARD BARDOS, ESQ.
Shulman, Hershfield, and Gilden, PA
1 E. Pratt Street, Suite 904
Baltimore, Maryland 21202
On Behalf of the Defendant

Also Present: Special Agent Jason Bender, FBI
Natalie Vallandingham, Pre-Trial Officer

Audio Operator: Lamar Purnell

Transcription Company: CompuScribe
P.O. Box 789
Cheltenham, Maryland 20706-9998

Proceeding recorded by electronic sound recording, transcript produced by transcription service.

# I N D E X


| | Page |
|---|---|
| Preliminary Matters | 3 |
| Comments by Richard Bardos, Esq. On Behalf of the Defendant | 4 |
| By Matthew Maddox, Esq. On Behalf of the Government | 9 |
| Rebuttal By Richard Bardos, Esq. | 37 |
| Surrebuttal by Matthew Maddox, Esq. | 49 |
| Ruling by Magistrate Judge Deborah L. Boardman | 49 |


KEYNOTE: "---" Indicates inaudible in transcript.
"*" Indicates phonetic spelling in transcript.

P R O C E E D I N G S

(Whereupon, at 4:09 p.m., the hearing began.)

THE CLERK: This Honorable Court now resumes its session. The Honorable Deborah L. Bowman presiding.

THE COURT: Good afternoon, everyone. We are here for a detention hearing in the matter of United States of America versus Medard Ulysse, CLR-21-054. Would Counsel for the Government please introduce themself?

MR. MADDOX: Yes, good afternoon, Your Honor. This is AUSA Matthew Maddox, appearing for the Government. I have with me Special Agent Jason Bender* with the FBI.

THE COURT: Okay. Good afternoon, to both of you. Agent Bender, good afternoon.

AGENT BENDER: Good afternoon, Your Honor.

THE COURT: All right. And for the Defendant? Counsel, introduce themself, please?

MR. BARDOS: Good afternoon, Your Honor. Richard Bardos, representing Medard Ulysse. Just before the Government proceeds with their argument, I do have one preliminary matter whenever the Court is interesting in hearing it.

THE COURT: Sure. Mr. Bardos, it is hard to hear, at least for me. I am not sure if other people are having a hard time hearing. If you could, maybe -- your speak into more directly in the microphone or speak up. I appreciate

it. Ms. Vallandingham, good to see you, as always.

MS. VALLANDINGHAM: Good to see you, Your Honor.

THE COURT: All right. Excuse me, one minute, please.

(Pause)

THE COURT: Thank you. Needed to get some water.

Mr. Ulysse, I can see you. Can you see and hear us? You are on mute. Can you nod if you can hear and see us? All right, very good. He has just nodded.

As a preliminary matter I have to acknowledge, of course, that we are proceeding in this extraordinary fashion, virtually, for this hearing because of the global pandemic.

We are now in our second year of the pandemic. Congress authorized us to proceed virtually here in Federal Court, in instances like this, during this public crisis, provided however, that the Defendant agrees. Mr. Bardos, have you spoken with your client or does he consent to proceeding virtually today?

MR. BARDOS: He consents, Your Honor.

THE COURT: He consents? All right, very good. Mr. Bardos, what is the preliminary matter that you would like raise before I hear the Government's argument for detention?

MR. BARDOS: Your Honor, I don't believe the Government is entitled to a detention hearing in this case.

First of all, I don't think detention is intended for non-violent and non-drug offense, but I think that Mr. Ulysse only falls under 18 U.S.C. 3142, if at all, with the --- of sub section -- sub paragraph (f)(2).

So, the case, as charged, is not a case under (f)(1), sub paragraphs (a), (b), or (c), right? It is not a --- imprisonment, it is not a drug case. So, the only possible way that we can even get to a detention hearing under (f)(1), is he had two prior felonies -- two prior qualifying felonies, which he does not have, which I will I will get to in a second. So, I believe that we were under (f)(2), and the only way --

THE COURT: Can you give me a minutes to get my codes, Mr. --

MR. BARDOS: -- that --- on a --- --

THE COURT: Mr. Bardos? Can you give me a minute to get my code, please?

MR. BARDOS: Sure.

(Long pause.)

THE COURT: All right.

(Pause)

THE COURT: Okay. I have got my code, I am ready for your argument. You were on, I believe, explaining why you think (f)(1) doesn't apply. Is that correct?

MR. BARDOS: That is correct. So, it doesn't --

there is crime charged under (a), (b), or (c), under (f)(1), ---. That crime of violence --- life imprisonment --

THE COURT: I am having a hard time hearing you. Is anyone else having a hard time hearing Mr. Bardos? Yes, I see people nodding. Perhaps, just moving the computer closer, I don't know.

MR. BARDOS: Well, it might help my voice, and it is just going to make my face bigger.

THE COURT: That is all right. I can you hear you better now, thank you.

MR. BARDOS: Okay. All right. So, I think we all agree that it is not under (a), (b), or (c), because the current charged case is not a crime of violence, is not a life imprisonment case, and not a drug case. So, the only way that (f)(1) could apply is under (b), if there were two or more State or local offenses that would have been offenses described in (a), (b), or (c), if the circumstance giving rise to Federal Jurisdiction ---.

So, I filed a -- what I titled this a motion, but it is really a -- just an explanation of the prior convictions for Mr. Ulysse. I think the parties agree that there is one that would qualify, and that is listed as a kidnaping. And I will explain there that it is not actually kidnaping. But regardless of what it is, it does carry a penalty of more than 10 years. And the other three are all

marijuana sales.

So, the memorandum -- the motion that I filed explains that in none of these cases carry anything more than 5 years, under State law, for their convictions. And they don't carry a possibility of more than 10 years under Federal laws either, because under 21 U.S.C. 841(b)(1)(e), if the marijuana sale is fewer than 50 kilograms, the maximum penalty is 5 years.

And there is nothing in any of these convictions that even suggests that this was more than 50 kilograms. In fact, there is a separate crime in Florida for more than 10 pounds, and Mr. Ulysse was not convicted of that. So, there is nothing in the pre-trial report, there is nothing in Mr. Ulysse's record that indicates that he has ever convicted of a crime, other than the kidnaping one, that the feds would have charged -- would be carrying more than 10 years.

I did have brief discussion with Mr. Maddox, and he suggested that because there is more than one marijuana sale, the second or third one might have qualified, under 21 U.S.C. 851, for an enhanced penalty. But not -- doesn't make the offense -- the offense doesn't carry a penalty of 5 years. It is only when added, the 851 ---, could be up 10, under 21 U.S.C. 841(b)(1)(e).

Therefore, there are no qualifying -- there is only one qualifying offense. Sub section (d) of (f)(1) doesn't

apply. None of the other ones do, until we move to (f)(2); (f)(2) is very different. (F)(2) requires a motion -- allows for a motion from the Government, only in case that involves a serious risk that a person will flee, or that they will attempt to obstruct justice.

And I believe the Government is only looking at (2)(a), the serious risk. What is interesting about this, judge, is that this phrase, serious risk, is the only place --- -- in format where that occurs. Because otherwise, the Court is supposed to -- is directed to find conditions that will reasonably assure the Defendant's appearance.

So, this use of serious risk is a heightened standard for the Government to show on their motion for a detention hearing, and they cannot meet that standard for several reasons. First of all, there is no failures to appear in the Defendant's record. So, he has got no indication that he would not ---.

He is an American citizen. Most importantly, he found out his house was searched on Tuesday of last week. He found out about it on Wednesday. He immediately contacted his attorney. His attorney said, "You should go turn yourself in." He said, "I could do that on Friday." His attorney said, "Fine," and told the United States Attorney's Office that Mr. Ulysse was going to drive up from Georgia and turn himself in on Friday, which he did.

He was told by his lawyer to look for something called Leomard* Street. He couldn't find Leomard Street, he couldn't -- courthouse isn't on Leomard Street. He contacted his lawyer again, found out it was Lombard Street. --- about an hour late on Friday.

But he turned himself in, from Georgia. He has significant ties to both Maryland and Georgia. He has a house in Georgia. He has a business in Georgia. He has a son, and his son's mother, who live in Maryland. So, there is no evidence of a serious risk of flight, and until the Government can meet that preliminary standard, I don't believe they are entitled to request a detention hearing. I didn't have a chance to make this argument in front of Judge Copperthite on Friday, but I wanted to make it before we got started today.

THE COURT: Okay. Mr. Maddox, did you want to be heard on this preliminary issue, of whether or not you are even entitled on the Bail Reform Act to move for detention?

MR. MADDOX: Yes. First, I just want to -- I guess, there are two issues; one is, the question of whether or not we are able to request a hearing under (f)(1). And then, the second question is whether it matters whether we are proceeding under (f)(1) or (f)(2). And I not sure that it does matter, and the fact I believe that it doesn't matter whether we are proceeding under (f)(1) and (f)(2).

Just to back up a little bit here about sub section (f). What it does is it essentially creates two pathways towards a detention hearing. On the first pathway, which was the subject of Mr. Bardos' argument, has to do with (f)(1), which means that the Government for move for a detention hearing if a certain offense is charged.

Our dispute is over sub section (f)(1)(b). And the Government does believe that we are able to move a detention hearing under that provision, because this is a case in which a felony is charged and this Defendant has been convicted of two or more offenses described in sub paragraphs (a) through (c), or two or more State or local offenses that would have been offenses described in paragraphs (a) through (c) of this paragraphs. It is circumstances giving rise if Federal jurisdiction existed, or a combination of such offenses.

So, what we have in the pre-trial services report is at least three convictions for drug tracking offenses. If the Defendant had been charged federally in the latter two, they would have resulted in offenses for which he would have faced a sentence of imprisonment of up to 10 years or more. And therefore, (c) would be satisfied twice, regardless of the kidnaping --

THE COURT: Which convictions are we talking about that would've triggered -- let me just be clear. We are all in agreement that the kidnaping conviction is a qualifying

conviction. The question is whether or not any of the narcotics offenses -- this looks like it is all marijuana in his record -- either individually or collectively, somehow, would've now, or satisfied a second -- the second conviction requirement, right?

MR. MADDOX: Yes, Your Honor.

THE COURT: Okay. So, just walk me through your -- see if we can identify them in the pre-trial report. That would be useful for me if you are able to do that.

MR. MADDOX: Okay, I am turning to that now, Your Honor.

THE COURT: Thank you so much.

MR. MADDOX: So, what we -- it is kind of hard to find because there seven pages full of contacts with law enforcement here. But I believe -- just give me one moment here. I believe that the first conviction for drug trafficking was one that occurred in September 2008, based on an arrest that occurred in December of 2007. Has Your Honor located that one?

THE COURT: I do. I have that one. I --

MR. MADDOX: Okay.

THE COURT: Do you know at the maximum possible period -- Mr. Bardos says it is 5 years, or under 10 years. Do you know?

MR. MADDOX: Yes. And that one that is not the one

I am relying upon, Your Honor --

THE COURT: Okay. Okay --

MR. MADDOX: If we proceed from there, there is an arrest in June of 2011, that resulted in a conviction for selling marijuana in November of 2012.

THE COURT: Okay.

MR. MADDOX: So, there is that one. And then, there is a -- well, there is an arrest in August of 2012, that resulted also in a conviction in November of 2012. So, there are two that follow the first one. Under 21 U.S.C. 841(b)(1)(d), any sort of recidivist drug trafficking offense can carry a sentence of up to 10 years in imprisonment, and I believe that is regardless of quantity.

So, this argument regarding quantity I don't believe is of any moment, because if he had been convicted subsequent to a prior drug trafficking conviction and charged federally, he could face up to 10 years incarceration, even at the very bottom of Section 841.

And therefore, those two offenses would both fall under -- they would be State equivalent offenses to offenses that fall under (f)(1)(c). So, based on that alone, even setting aside the kidnaping conviction, the Government would satisfy sub section (f)(1).

(Pause)

THE COURT: Mr. Bardos, why doesn't that -- why

doesn't 21 U.S.C. 841(b)(1)(d) apply here where it says, "If any person commit such violation after a prior conviction before a felony drug offense, such person shall be sentenced to a term of not more than 10 years. Why doesn't that apply to the second or third marijuana conviction?

MR. BARDOS: Is not an enhancement, is not automatic, and (f)(1)(c) says, it has to be an offense for which a maximum term of imprisonment continues or is prescribed. The offense itself carries a maximum penalty of 5 years. There is a possible enhancement, under 21 U.S.C. 851, that can take up to 10 years, but the offense itself carries a maximum penalty of 5.

THE COURT: Okay. I understand your argument. A very interesting argument. Would have been very interesting to read cases or brief it. None of us have the time for that. Here is what I would like to do. I think it is an interesting issue. I am going to allow the Government to proceed on -- for a detention hearing, pursuant to (f)(1). However, I -- my understanding was, the Government was actually moving for -- based on flight risk.

MR. MADDOX: Your Honor, the Government is moving based on risk of flight and danger to the community. And I believe that even -- whether regardless of whether (f)(1) apply or (f)(2) apply, the Government can make arguments as to both factors in arguing for detention. And I believe that

sub section (f) bears that out. And that may be a related threshold issue for the Court to take up. Mr. Bardos didn't directly address that, but that is the Government's position.

THE COURT: Why don't we do this? Let's proceed with the detention hearing. Mr. Bardos has made his argument. He has preserved it. If he thinks I varied in allowing a proceeding -- the hearing to go forward, he can appeal. So, Mr. Maddox, I am happy to hear from you.

MR. MADDOX: Thank you. Turning to the factors for the Court to consider under 3142(g), in taking up first the nature and circumstances of this offense, the nature of the offense in this case charged is a heartless fraud scheme. It took advantage of dozens of vulnerable elders, by causing the victims to send cash to locations supplied under this Defendant's direction, and they were provided under the false pretense that the victim's grandchild were -- was in deep trouble, needed money fast.

More than 70 elders were duped into sending thousands of dollars of cash, each, to various locations, in multiple regions of the United States, including the State of Maryland. And those losses total well over $1.5 million. The Defendant directed a crew of runners who picked up the cash and delivered it to him, shielding him from the risk of getting caught, while allowing his runners to be arrested on multiple occasions.

The Defendant, in fact, sat at the top of a pyramid, under him or his Co-Defendants, English and Avboraye-Igbinedion. Underneath them, various runners recruited by both the Defendant, personally, and by English and Avboraye-Igbinedion. They now highlight the fact that the instance -- the instant offense here, in both extensive domestic travel, by both the Defendant and others, were grouped -- recruited into the scheme.

Turning to the weight of the evidence against this Defendant. That evidence does include text messages between the Defendant and his co-conspirators, found on seized devices, which identify locations where packages from victims are to be delivered and picked up by runners in the scheme.

They include travel records, documenting travel by this Defendant, to Maryland from Florida, during time periods when packages were delivered and picked up by members of the conspiracy, cell site records placing the Defendant's cell in an area where packages were to be picked up, Lyft records fro the Defendant's own Lyft account, placing him in the vicinity of package deliveries, as well as the accounts of several witnesses with personal knowledge of the scheme.

I will note that, also, that two defendants in the related -- in a related case but the same scheme, Your Honor, by the names of McArnold Charlemagne and David Green, have each pleaded guilty, in this Court, for their roles in the

scheme. And they are both pending sentencing.

Turning to the history and characteristics of this Defendant. The pre-trial services report outlines numerous arrests and contacts the Defendant had with law enforcement, which fill up seven pages of the pre-trial services report. The context -- I will just pause here.

THE COURT: I am here, I apologize. I am listening. You couldn't tell I was listening, but I had to try to fix the light. Please, go ahead --

MR. MADDOX: Thank you --

THE COURT: Can I ask you a question about the two Co-Defendants who pled guilty? They are detained?

MR. MADDOX: They are not detained, Your Honor.

THE COURT: Okay. Go ahead.

MR. MADDOX: But again, they don't have anywhere near the criminal history of this Defendant.

THE COURT: I understand. No, I understand, that everyone is different. Was just checking --

MR. MADDOX: Okay.

THE COURT: Thank you.

MR. MADDOX: The contacts this Defendant had with law enforcement ranged from minor to extremely serious, and they involved frauds, thefts, drugs, and multiple minor victims. ---, the Defendant was convicted of human trafficking Florida, in 2016, what the pre-trial services

report listed as a kidnaping conviction.

I have a Miami-Dade Police Department report that states that in June of 2013, the Defendant was involved with trafficking a juvenile victim for commercial sex. And I am not going to go as far as to read the report, Your Honor, given your -- given our limited time, but it does note that a law enforcement officer personally observed the Defendant assaulting the victim, before that victim made contact with an undercover detective, and then offered commercial -- offered sex to that detective, in exchange for money.

During the takedown, the victim ended up stating that she gave all of her money for commercial sex to the Defendant, and had been engaged in commercial sex for him over the course of three weeks. The Defendant was ultimately charged with a 4 year sentence in that case.

If the Defendant had been charged federally, we will not even be here, Your Honor, because the Defendant would have been serving a 10 year mandatory minimum sentence, and would not be out in the community committing multiple assaults and executing multiple fraud schemes, as he ended up doing following his release from custody in the sex trafficking case.

So, it wasn't long after his release from the sex trafficking case that he got involved in the elder fraud scheme charged in this case. During the scheme, the

Defendant both inflicted and threatened physical violence against the recruits and co-conspirators int the scheme.

There is a Miami-Dade Police Department report, dated March 16, 2018, that indicates that Charlemagne, who was one of the Defendants who recently pled guilty, was physically assaulted by an individual he identified as Jay Money*, who the Government knows to be this Defendant, Mr. Ulysse.

Charlemagne gave a statement to the police at the time, that he and J. Money were discussing business and had a dispute over money. And then, Jay Money began punching Charlemagne in the face. Jay Money then fled the scene in a BMW before the police arrived. Charlemagne was treated for injuries to his face after that altercation, Your Honor.

Charlemagne described -- well, he was described in the police report as not fully cooperative, to completely uncooperative with police. He refused to provide the -- a full description of Jay Money, though he did provide a partial description that does match a description of this Defendant.

And he refused to provide Jay Money's real name.

The Government has since obtained information that Charlemagne and this Defendant were arguing over money from this fraud scheme charged in this case, which would explain why Charlemagne did not provide information to the police at

the time, because that would have implicated him in the crime.

The Government has also obtained information that the Defendant assaulted and threatened to kill other participants in the scheme, due to his belief that fraud proceeds were being stolen from him. He also threatened violence to deter recruits from talking to law enforcement.

The Defendant knows a great deal about the other participants in this scheme, Your Honor, including where some of their relatives live. None of them would be safe if the Defendant was released pending trial in this matter. It also noteworthy that the same law firm that represented the Defendant in his sex trafficking case ended up representing or seeking to represent several participants in the elder fraud scheme charged in this case, during multiple contacts with law enforcement, between various runners in this fraud scheme, and law enforcement, when they were facing State charges.

The Defendant supplied this legal representation to these participants, which raises concerns about his access to potential witnesses, and his willingness to take action to prevent them from cooperating with law enforcement. The Defendant's violence was not only directed to others involved in this fraud scheme, but also to complete strangers.

On October 6, 2018, the Defendant assaulted a

traffic control employee at the parking garage, in Union Station, in Washington, D.C. The Government has a District of Columbia Metropolitan Police Department report, which states that, based on the victim's and multiple witnesses accounts, this Defendant entered the parking garage in a vehicle, and was told by the victim employee that he could not be there.

The Defendant parked his vehicle there anyways. And he was with his Co-Defendant, Amaya English at the time, who was in front of the vehicle. The Defendant got out of the vehicle and began punching the victim. And then, police officers stepped in to break up the fight, and then attempted to detain this Defendant.

During that period of time, Ms. English, the Co-Defendant, began -- well, she got out of the car and she began punching the victim herself. The Defendant and Ms. English were both arrested at that time, and the Defendant was found in possession of $114,000 in -- well, actually, $114,500, was found in possession at the time of his arrest. He ended up claiming his property a few days later.

On September 9, 2019, the Defendant assaulted another man, in Conyers, Georgia, during a hit and run. There is a Conyers Police Department report that states that the Defendant hit another vehicle in a parking lot. Then, he

got out of his vehicle, got within inches of the face of the driver of the other vehicle, and then, began yelling at the driver.

The driver pulled out his cellphone in order to record the altercation. When the driver tried to take a photograph of the Defendant's license plate, the Defendant pushed him and grabbed his phone out of his hand, and ordered the driver to get back into the car and leave.

The driver was apparently intimidated, and he got back into his car. At which point, the Defendant threw the driver's cellphone into the driver's car. And then, he got into his own vehicle and left. So, this was a clear case of hit and run, on top of assault.

The Defendant was driving a vehicle that had an insurance policy on it in another person's name. So, it was no simple matter, identifying the Defendant as the person responsible for the assault and the hit and run. Defendant was eventually contacted by Conyers Police Department, and he denied his involvement in the incident.

However, cell site records placed the Defendant's cellphone in the area of the incident at the time that it occurred. And there is an active arrest warrant, at this time, in that Conyers case. The Defendant has known about that arrest warrant, but he has declined to turn himself in to Conyer's Police Department.

Following the Defendant's leadership role in the fraud scheme charged in this case, and since the pandemic hit, the Defendant has also involved himself in an unemployment insurance fraud scheme. In November of 2020, the Defendant was arrested as the driver in a rental vehicle that was not rented in his name or his passenger's name.

A search of the car resulted in the seizure of three binders, containing the personal identifying information of approximately 165 different individuals. Additionally, the Defendant -- the vehicle also had 26 debit cards that were not either in the Defendant or his passenger's names, and they were concealed under the headliner -- in the headliner of the vehicle. And there was also $34,000 in cash. Some of the debit cards are believed to be associated with unemployment insurance benefits issued in other persons' name. The Defendant was arrested, charged, and eventually, he was released on bond in that case.

The Defendant became aware of the arrest warrant in this case about a week ago, on last Wednesday, and he became aware of it that morning. Contrary to what Mr. Bardos reported, the Defendant was advised to turn himself in immediately, not just by the Government, but also by -- directly by his attorney, in the State -- the George State case, but he has apparently refused to do that.

He indicated that he would turn himself in on

Friday instead, despite being advised by his attorney to turn himself in immediately. And he did, in turn -- he did, indeed, turn himself in last Friday, but it is unclear and unknown how he spent those two days. And the Government, at this time, doesn't have any evidence but it has real concerns that he spent that time destroying evidence, or arranging contacts with potential witnesses.

This Defendant has ties in various states. He was provided -- and, you know, given his ties in various states, he has provided inconsistent information about his residency during his various law enforcement contacts. Upon his release from custody, after the November 2020 arrest, the Defendant listed his address as a place on Terrence Street, in Atlanta, Georgia; not the same address he has provided to pre-trial in this case. And it is also -- I also looked at the DA's Office in Georgia, has his address listed as somewhere in Miami, Florida, where he also has a history.

The Defendant was also stopped by the North Bay Village Police Department*, in December of 2020, again, driving a rental car and it was not rented in his name. And he told the officers that he was staying at a short-term and very expensive vacation rental property, located on South Treasure Drive, in North Bay Village, Florida.

The investigation has also revealed that the Defendant is also associated with the address he has provided

to pre-trial in this case, which is 475 Oak Hill Road, in Covington, Georgia*. And a search warrant was executed at that residence last week, Your Honor, and during execution of that search warrant, law enforcement found in a bathroom, a stolen firearm, or a firearm that had been reported stolen.

It was a .40 caliber Taurus firearm, registered to an owner who resides in Baltimore, Maryland. So, this is a weapon that is found in Covington, Georgia, belonging to an individual who resides in Baltimore, Maryland. The owner purchased that gun in early 2020. He reported that he placed it inside of a lockbox, and then placed that lockbox in a bag inside of a vehicle of a friend, and that vehicle was broken into in March of 2020. The owner of the firearm does not know the Defendant.

Turning to the Defendant's employment history. It is intermittent and questionable, at best. But the Defendant apparently has --

THE COURT: Before we get to employment, can I ask --- -- one, I am going to turn the light on in my office, two, I am going to ask you some questions about the alleged offense. Okay? One minute.

MR. MADDOX: Thank you.

THE COURT: Okay. So, you said that the two Co-Defendants here have already pled guilty. When did that happen? I am trying to figure out when Mr. Ulysse learned

about this. You told me he learned about the warrant for his arrest last week, but when did he -- clearly, at some point, you lost contact, or I would imagine -- with the two individuals who have pled guilty.

MR. MADDOX: Yes, the two Defendants who have pled guilty are -- pled guilty in a separate case, Your Honor. This case was indicted after those two individuals pled guilty. He found out --

THE COURT: --- --

MR. MADDOX: He found out about --

THE COURT: When did they plead guilty?

MR. MADDOX: They pled guilty, I believe -- I don't have that date right in front of me, but I believe late last year, Your Honor.

THE COURT: And do you have any evidence that Mr. Ulysse has contacted them, or their relatives, and threatened them since they have been charged with anything?

MR. MADDOX: No, but I will have to note that only a week has passed the Defendant became aware of this case. So --

THE COURT: I guess, that is what I am trying to figure out. Did he become aware of it previously, when they were charged?

MR. MADDOX: Well, the Government doesn't have any information about --

THE COURT: ---. When you talk about -- you went through it with the litany of times in he inflicted or threatened physical violence on Charlemagne, and on -- and --- the, I guess, the D.C. traffic controller. What evidence do you have of that? What is the evidence of that?

MR. MADDOX: I have reports, police reports documenting these incidents, Your Honor. And I will note, to the D.C. incident, there are several witness reports about that. There is a witness -- a handwritten witness -- I am sorry -- a handwritten account, by the victim himself, as well as handwritten accounts by police officers who were detaining the Defendant while this was occurring, because they were eye witnesses to the assault.

THE COURT: Did it result in a conviction?

MR. MADDOX: No, that charged -- he has never turned himself in -- well, he was arrested on that charge but I believe -- I am not sure what the current status of the charges. It may be dismissed at this point.

THE COURT: And that was in the District of Columbia? I see, simple assault. Yes, I see it. Okay. --- --

MR. MADDOX: And he was not charged in the assault against Charlemagne because Charlemagne was uncooperative with law enforcement.

THE COURT: Understood. What is your evidence,

other than Charlemagne's word, that there was allegations of violence and threats of violence by Mr. Ulysse, in this particular fraud scheme?

MR. MADDOX: Well, just to be clear, I didn't represent that Charlemagne made that representation. I indicated with statements he made to law enforcement at the time. He was contacted after Mr. Ulysse beat him up, essentially, a couple years ago. But we have multiple witnesses in this case, Your Honor, people with firsthand knowledge of the fraud scheme, who have stated that multiple individuals were on the receiving end of threats by this Defendant, if either they talked to law enforcement or if they stole money from him.

THE COURT: Okay.

MR. MADDOX: And I just -- I don't feel at liberty to disclose the identify of those witnesses.

THE COURT: Understood. I understand. What is going on with the -- I guess, it was the case arising out of the seizure of the three binders of personal identifying information, with 26 debit cards, and it is related to an alleged unemployment insurance fraud. What is going on in that case?

MR. MADDOX: It is pending, it is very young, Your Honor. The charge arose in November of 2020, and I understand that the charges in that case are pending. And

the investigation of the matter is ongoing. We do find that there is a nexus between that fraud scheme in Maryland. So, it is a matter that my office is considering for charges.

THE COURT: And when I look at the indictment, it looks like this alleged fraud scheme occurred in January of 2018, through November 2019, correct?

MR. MADDOX: Yes, Your Honor.

THE COURT: And I don't want to -- I am sure not going to press you for details of your investigation tactics and your reasoning, but I am curious why it now is 15 months later that -- and if you don't want to answer you don't have to do, but there is a 15 month gap in which Government knows about this conduct, and nothing is done, at least not from the -- at least not --- what I can see, --- investigation going on?

MR. MADDOX: Well, I think to certain extent, that is a fair question, Your Honor. I don't want to go into details about our investigation. However, I can say as a general matter, as I said before, the Defendant did an exceedingly good job of shielding himself from detection in this case. He is not -- he avoided being the one actually going to the doorsteps and picking up packages, and so forth.

He communicated through encrypted communications with other conspirators in the case. So, he shielded himself from detection very well. That is a, sort of, a general

explanation as to the delta of time between the conduct occurring and the charges in this case.

THE COURT: Okay. You were talking about employment history. I am ready to hear about that.

MR. MADDOX: Yes, I don't have much to say on that, other than if you look at the pre-trial services report, it said, intermittent and sort of questionable, at best. But somehow, the Defendant does have extensive resources, and I don't think that much can be disputed.

I noted earlier, a very expensive rental home that he claimed to be renting during a recent police contact. He also has a house in Georgia worth $315,000. He has also been associated with several other residences, both in Georgia and in Florida. I noted during the D.C. incident, he had more than $114,000 in his possession at the time of that arrest.

And then, in the recent arrest, in November of 2020, in Georgia, he had more than $30,000 in his possession. And so, there are extensive financial resources, obviously, that could aide him in flight if he choose to flee.

THE COURT: I am just struggling with the flight, honestly, because turning yourself in, driving up here from Georgia to Baltimore, knowing you are facing a Federal indictment. I mean, it doesn't -- what does that tell us, Mr. Maddox?

MR. MADDOX: Well, I am not sure that he drove up

here from Georgia. This was mentioned at the hearing last week in front of Judge Copperthite. I presumed that he was in Georgia at the time he became aware of the arrest warrant, but he claims that he wasn't. He claims that he was closer to our district at the time. I don't know where he was.

That is one point. And the other point is that he was advised not to turn himself in Baltimore, he was advised to turn himself in at any Federal courthouse that was closest to wherever he was. And again, we don't know where he was, but in every state in this union, there is a Federal courthouse. And he has the ability to figure out where to turn himself in and he, from the very beginning, said he wasn't turning himself in that day.

And that raises concerns for the Government, Your Honor, because he could have been doing anything those two days. Trying --

THE COURT: I think you are real concerned -- if I am really understanding it is, it is not really risk of flight because he did turn himself in relatively shortly after learning it, it is that you think he is obstructing justice, or continuing to commit fraud. Is that right?

MR. MADDOX: Well, there is -- given the -- I guess, the pattern of conduct, there is a concern that he may have continued to commit fraud. Given his pattern and how he dealt with his co-conspirators, there could -- there is a

real concern that he could've been instructing -- obstructing justice. I really don't know. He was unaccountable.

I do think that there is a real risk of flight, given his ties all over this -- in various states and, like, no consistent, stable residence, given that situation, Your Honor, and given his perchance for frequent travel -- and he traveled multiple times in connection with the fraud scheme charged in this case, and given his financial resources, and given the fact that he has access to numerous individuals' personal identifying information, all of these could aide him in avoiding prosecution in this case by declining to appear for future proceedings. So, the Government does feel like there is a serious risk of flight here --

THE COURT: ---. I don't necessarily disagree with what you said, but if that was true then why wouldn't he have done that when he learned about the warrant? Why would he have turned himself in? I guess, that is the disconnect I am having trouble with.

MR. MADDOX: Well, he knew that he had to turn himself in quickly, otherwise, the FBI was on his heels. I believe that it will take more preparation to make an effective flight from prosecution, and if he is released in this case he will have all the time in the world. There will be several months before he faces trial in this case, and that is several months to prepare for flight from

prosecution, Your Honor.

THE COURT: Okay.

MR. MADDOX: Anybody can get up and leave, anybody can get up and walk out the door. I believe this Defendant is too smart for that, and he has the resources to do it in a more intelligent way. And I believe that if he is released in this case, he will have all the time in the world to make an effective flight.

THE COURT: Okay. Is there anything else, Mr. Maddox?

MR. MADDOX: I just wanted to touch on the proposed third party custodian, Your Honor.

THE COURT: Yes, please.

MR. MADDOX: So, the Defendant does a child with a woman who resides in Maryland, and I believe she stepped forward as a potential third party custodian. She was interviewed by FBI in this case, and she indicated that the Defendant last spoke with her last Wednesday, and that he was going to visit but ended up not visiting.

So again, we don't know -- he could've been visiting his child during the two days that he was out and about, but apparently that is not what he was doing. It is unclear whether that was before -- you know, the contact that he had with her last Wednesday was before or after he found out about the arrest warrant.

But it is clear that the Defendant last visited this child more than a month ago, and he has only seen the child a few times in the last five years, according to the statement of the child's mother. Also, it is noteworthy that the child's mother thought the Defendant worked in real estate, out of an office. But the pre-trial services report does not indicate any claim by the Defendant that he worked in real estate.

I think in the addendum, perhaps, some mention is made about a company called something properties, which may indicate an involvement in real estate. But the initial pre-trial services report indicated that the Defendant has been a dog breeder for several years, and there is no mention of real estate. And the Government is not aware of any employment in real estate.

The Defendant's child reportedly suffers from medical conditions that would put him at risk of severe illness from COVID-19. So, the Government believes it would be an undo risk to that child to place the Defendant in that house.

In addition, Your Honor, the Government also has a Department -- I am sorry, a District of Columbia Metropolitan Police Department incident report, dated August 28, 2018. It indicates this Defendant and his child's mother engaged in a verbal altercation wherein the Defendant began yelling at the

child's mother while they were both traveling in a vehicle in D.C.

And the Defendant eventually made the child's mother get out of the car, and then threw her luggage as well as his child's luggage out of the car during incident. And then, he fled the scene, leaving her there. And she reported that that is what happened to the police department after they made contact with her.

I will note that pre-trial services was not aware of this incident at the time that they filed their addendum, and it may be that their conclusion as to the appropriateness of the third party custodian that has been proposed would be different, had they been aware of that altercation between the Defendant his child's mother.

Another factor under the Bail Reform Act is whether the Defendant was on release, pending trial in another matter at the time this was -- of his arrest in this case. And I will note, the Defendant, as I noted earlier, is on release in his State case, before he came into custody in this case.

So, in sum, this case presents numerous indicators that the Defendant will not appear for proceedings in this case, and would pose a danger to the community, if released. As to risk of flight, notwithstanding an extensive criminal history, the Defendant has never been charged with so serious an offense that -- wherein, he has been released pre-trial.

I will note that during the sex trafficking case, it appears that he was detained that entire time. So, he is facing very serious penalties in this case that would give him an incentive to flee. He also has ties in various states, as I indicated earlier, and ready access to stolen identify information that could aide him in flight.

As to danger to the community, it is clear that the Defendant has a short fuse and does not take -- it does not take much to set him off into violent action, given the altercations he has had with complete strangers. He has also had altercations with acquaintances over very minor issues.

The aggression that he demonstrated towards police officers during the D.C. incident should raise significant concerns for the Court. Given the history of domestic disturbance between him and his child's mother, there is real -- there is a real question as to the wisdom of placing him in that home, pending trial, given how stressful the circumstance he is now in, under Federal prosecution, and how he could maybe easily set off to anger and violence in the household.

The Defendant may also pose a risk of -- or a risk of harm to potential witnesses in this case, given his pattern with co-defendants or co-conspirators in the scheme, whom he has threatened or assaulted in the past. So, for all of these reasons, Your Honor, the Government does request

that the Defendant be ordered detained pending trial in this case.

THE COURT: I know it is early, Mr. Maddox, but you are familiar with the case, and certainly, the co-defendants. If he were -- big if, and he is presumed innocent, and I am very mindful of that. But if he were convicted, what are the guidelines here?

MR. MADDOX: That is a very good question, Your Honor. If you don't mind, I have that calculated --

THE COURT: Take your time.

MR. MADDOX: -- but it may take me a second to pull that up.

THE COURT: Take your time.

(Pause)

MR. MADDOX: I apologize, Your Honor. I actually don't have the calculation of his criminal history, but I believe, based on the evidence, that his Offense Level would be at least a 34, which would place him at the bottom, even he was Criminal History Category 1, he would be facing about 12 years on the -- at the low end. I believe he is --

THE COURT: ---. I am going to turn my light on again, sorry. Hold on.

MR. MADDOX: Sure.

THE COURT: It says 34, with all of the enhancements and ---.

MR. MADDOX: Yes, Your Honor. So, under the Guidelines, section (2)(b)(1.11)(a), he has a base Offense Level of 7. There would be an increase of 16 levels, because the losses in this case exceeded $1.5 million. There is another increase of six levels, because the offense resulted in substantial financial hardship to 25 or more victims.

I will note, Your Honor, some of these victims -- these are very elderly people on fixed income, and they have retirement savings. Some of them emptied their savings in response to the fraud scheme in this case. So, there is definitely severe financial hardship against 25 or more victims.

The Offense Level is increased again, at least four levels, due to the Defendant being an organizer, leader, or a manager of several other individuals in criminal activity. So --

THE COURT: Okay. I understand. I don't want to litigate the guidelines, Mr. -- I just want to know, generally. That is helpful. I understand where some of the enhancements are. Right.

MR. MADDOX: Thank you.

THE COURT: Yes. Okay. Mr. Bardos?

MR. BARDOS: Your Honor, I am just tickled pink that the Court managed to mention innocent until proven guilty, because that phrase seems to have been completely

omitted on nearly everything that Mr. Maddox said. He reads reports of witnesses and determines it is not that it was reported, but that, in fact, the assault occurred. And you and I both know, that is not necessarily the way it goes.

The idea that every single time a co-defendant says something about one of his co-defendants, that that is automatically what happened, or that is automatically true. It is just not --- by reality. And almost everything that Mr. Maddox said, other than what is in this case, is unreported -- is reported, uncharged, unconvicted, many of those things that nobody even felt was worth even going forward with an arrest warrant or charges.

A lot of what Government is presenting here is allegations, unproven, unchallenged, and as a defense attorney, I would like the opportunity to challenge all of those things. But that is not what the purpose of this hearing is.

So, I am not going to focus on those things because I think that, for the Government to come in and say, "Well, we have this fraud crime, and we think he should be detained." But if all of these hearsay allegations, of all of these people who wrote whatever they wrote, that was never cross examined, not under oath, not challenged, I just think that that is real off point from what the Bail Reform Act is supposed to be looking at.

And then, the Government also says that he has ready -- that Mr. Ulysse has ready access to personal identifying information. I did not hear any basis for that, except that, apparently, he was arrested with three binders that had personal information in them.

Now, I was not there but I am going to assume that those binders were seized. The Court has heard nothing that Mr. Ulysse has ongoing access to other people's information, where that information even came from, that he was the person who got the information from the original source. So, there is nothing that suggests that he could assume a false identity.

He has never done that in the past, there is information -- indication that he has done that in the past. And I think the -- with regard to all these threats against Co-Defendants in this case, here is what actually happened, Judge. Mr. Ulysse knows what happened. He knows what he did, he knows what he said.

And he was sitting there in Georgia, or some place in the --- of Georgia. And he thought, "Wow, I've been charged with this fraud but I know I," -- "You know, I've threatened people, and I've beaten people. I can't possibly go to Maryland turn myself in. I'll never ---." None of that stuff happened.

That is what Co-Defendants in cooperation said in

this case. And instead, what Mr. Ulysse said is, "I'm going to turn myself in." Now, I can tell Your Honor that I spoke to his Georgia lawyer. I spoke to his Florida lawyer, and both of them told exactly the same thing; that Mr. Ulysse said to them, "What should I do?" And they said, "It makes more sense to turn yourself in in Maryland than to turn yourself in in Georgia, because if you turn yourself in in Georgia, it is an indefinite period before somebody comes to get you."

And frankly, Your Honor, I would've given him exactly the same advice. So, if he said, "All right. I can turn myself in Friday morning." And that is what he did. This idea that he refused to go in Thursday, that is not what either one of those lawyers is saying. And in fact, the Georgia lawyer expressly told me, that is not what happened.

And he told him -- he said that Mr. Ulysse said, "Friday." He said, "Fine. Go up there by 9 o'clock on Friday," and that is what he did. He was a little late, but that is what he did. So, this idea that he is this terrible, horrible, abusive person --- and he knows that is belied by the fact that he actually came here, voluntarily, on his own, driving up from Georgia or Florida, wherever he started from, to face these charges.

So, a lot of what the Government is saying to you is either not substantiated or just plain irrelevant. He

does have this -- what is called, sex trafficking case in Florida. And what actually happened was, he was with a young woman who he thought was over the age of 18.

He was convicted of profiting from her prostitution and that is, in fact, what the court records say from that particular thing. I don't know why --- in the -- in pre-trial ---. So, I know that is what the original charge was, but I have the document from the court in Florida, that shows the change in what the charge was, and what the plea was. If the Court is interested, that makes a difference.

But I can proffer that he pled to human trafficking, under a Florida statute that prohibits the profiting from prostitution of a minor. He did not know that --- minor. But that is -- it wasn't like he was traveling all over the country with people. It was a single person, a single incident, and that is what that offense was.

And that offense was in 2013. That is the last time he has been --- any sort of crime, according to his -- according to pre-trial report. Before that, the only thing he has are marijuana sales, in 2012, and two of them in 2011. The 2011 ones were both sentenced at the same time, and basically treated as one offense. I understand they are not, for several purposes, but they were treated that way.

What the Government touched on, is that Mr. Ulysse has a son. The son is seven-years-old. The pre-trial

addendum reports that his son has adrenoleukodystrophy, which is a genetic condition -- a very rare condition, that destroys the myelin sheath around the nerve cells in the brain, and precludes -- and prevents the brain from sending out messages to the rest of the body.

I have spoke with this child's mother. She --- he is fighting for his life. He cannot eat, he cannot drink, he cannot speak, and he barely breathes on his own, and he has had this disease for three years. She describes Mr. Ulysse as a good father, a caring father, and when he comes to be there, he takes care of his son.

So, this idea that in 2018, they had an argument on the side of the road, and therefore, there is domestic violence, is just belied by what she said. And I asked her, "If he got out of jail, could he come live with you?" And she said, "Absolutely." He hasn't lived with this woman, but she said he could come and live with her. She obviously doesn't fear in danger -- feel in danger from him. She obviously doesn't think that whatever happened in 2018 is still ongoing, two and a half years later.

So, I don't think there is much of a flight issue, Your Honor. The pre-trial report recommends release. Obviously, we agree with that. It recommends release on personal recognizance, which frankly, I rarely see in pre-trial reports. But if the Court is concerned about flight, I

would offer that electronic home monitoring and 24/7 staying in either his house or -- in Georgia, or his son's house, here.

And I asked her about that, too. I said, "Look, if he gets released, he might be here 24 hours a day." She said, "That's fine." There is another room that she can go to, he can have his own room. So, we have a place for him to go.

So, yes, the -- I agree with the Government that the type of offense charged here is serious and undefendable. I agree with that. And it is serious. But it is not a drug case. And the Court -- judges of this Court have released people who have sold heroin, have released people in violence offenses. This is neither of those things.

Now, the Government is trying to make it one by these other allegations, but it simply is not. It is a monetary fraud case. This is a man who has a criminal history that is relatively old. And I agree, that this is the most serious charge he has faced, but obviously nothing is proven until it actually proven.

My biggest concern, Your Honor, is that this man sends --- time, he is fighting for his life. We are in the middle of a pandemic. The Court, I don't -- I imagine you are aware, Judge, that the Court has been setting the trial dates based on the age of the case. So, this case is going

at the very, very end of whatever is going to happen with regard to trials.

And the most likely outcome here is that his son does not survive Mr. Ulysse's pre-trial detention. And that, quite frankly, Your Honor, is my biggest concern. Family ties is one of the factors, under the Bail Reform Act, and I think his connection to his son is significant and important, and that he understands that he would not do anything to --- he would not do anything to violate his terms, because he knows that would separate him from his son. And that is a very, very strong indication of -- that he will abide by the conditions, and would show up when he is supposed to, and not violate any of the terms, with regard to contacting his Co-Defendants.

Who, by the way, I have been meaning -- I believe everyone else in this case been released. And so, I --- contest that Mr. Ulysse is at the top of this pyramid. I have evidence to suggest otherwise, but nevertheless. All of the other people participating in this same type of offense that Mr. Ulysse is charged with, the same serious nature of the offense, and they have all been released.

So, I think that combined with his -- turning himself in, and his relatively old criminal history, and his significant ties to both Maryland and Georgia would warrant his release in this case. If the Court believes electronic

home monitoring is necessary, we would certainly want to do that. But to leave him in CDF, a place that up until recently was so infected with the virus, they couldn't accept new inmates. They just recently started accepting new inmates, and have two new positives.

So, it is a very dangerous place at CDF, for anybody. And I think, under these circumstances, Mr. Ulysse should be released under the conditions identified by pre-trial services. Thanks, Judge.

THE COURT: Mr. Bardos, thank you very much. Can I go into a breakout room with Vallandingham, please? And then, Mr. Purnell, if you could come with us, we should talk, about the two other hearings that we are backing off. But can I speak to --

THE CLERK: Okay.

THE COURT: -- Ms. Vallandingham, privately?

THE CLERK: Okay, will do.

(Whereupon, the sealed portion of the hearing followed and concluded.)

THE COURT: Okay. Mr. Maddox, is there anything else you wanted to say after Mr. Bardos' presentation?

MR. MADDOX: No. Just as to the point regarding access to personal identifying information being found on a single individual -- or two individuals in that vehicle. But I will note that some more personal identifying information

was found in the Defendant's home there, in Covington, Georgia, during the search warrant last week.

So, what I mean by say that -- what I mean to say is that, just because it is written down on a piece of paper doesn't mean -- that is more indication that a person knows where to get it from. It is not like someone handed a piece of paper to this individual that had personal information on it. He got it from somewhere else, most likely, the internet.

THE COURT: Okay. Just give me one moment, please. Okay. I do want to note that Ms. Vallandingham advised me that -- the proposed third party custodian ---, she is on the public access line. So, this wouldn't -- I am acknowledging you. I know you can't speak. It is just as -- like if we were in court, and you would be in the gallery and unable to speak. But I am acknowledging your presence. And I know you have been on the line the whole time. So, thank you.

All right. Mr. Ulysse, I have considered the arguments from Counsel, and the pre-trial services report and the addendum. And I want to speak directly to you about my ruling and my thinking here. I am required under the law to apply the Bail Reform Act. And that is a law passed by Congress about 35 years ago.

It requires me to consider whether there are release conditions that reasonably --- me that you will

appear in court, and will reasonably assure me that your release will not pose a danger to the community. And in doing that, I consider the nature and the circumstances of the offense charged here.

And here, you are charged with a conspiracy to commit fraud. I consider whether or not there is an alleged crime of violence in the case. There is not. I consider the weight of evidence against you, your history and characteristics, your physical and mental conditions, your family ties, employment history, criminal history, --- alcohol history.

And I consider whether at the time of the alleged offense, you were on probation and parole, and I don't see any record that you were on probation or parole at the time of the alleged offense. I finally consider the nature and seriousness of the danger to any person that would be posed by your release.

And so, when I consider all those factors, I first want to talk about flight risk and whether I think the Government has met its burden of establishing, by a preponderance, that you are a flight risk and are no conditions that would reasonably assure me of your appearance.

And while I think the Government --- good arguments that --- supported by a solid proffer, that you would have

the means to flee, and possibly -- and be --- and -- the fac that you turned yourself in after learning about a Federal indictment, and the fact that you have got ties, certainly to Georgia, and ties to Maryland. But most significantly, that you turned yourself in, knowing you were facing a Federal indictment, that, to me, is enough to convince me that I could set conditions that would reasonably assure your appearance.

I think the harder question, frankly, is whether or not I can find release conditions that would reasonably assure me that you wouldn't pose a danger to the community. And --- danger to the community --- by the Government is, I think, two-fold. I think the potential danger to the community is a continuation of economic crime.

We are not talking about the alleged crime here, in the wake of the evidence admitted. And the other dangers seems to be from the Government's allegations and proffer of a volatility, of a -- physical acts of violence and threats of violence, to a number of people.

I take Mr. Bardos' point, which is, those allegations are based on reports, haven't been proven in a court of law. But nonetheless, there were a number of --- Mr. Maddox. And certainly, apparently, aggression towards a D.C. police officer a couple years ago.

So, let me first talk about the offense, which I

have to consider the allegations. This is an allegation of a significant --- of fraud. Dozens -- I forget the number, but dozens of elderly victims, people in their 70s and 80s, who have grandchildren, who were contacted and told that they should send cash to private locations, or through secret locations in order to get their grandchildren out of jail, pre-trial.

My understanding is that over a period of less than a year, $1.5 million was taken from these seniors. Some of them have since died. I further understand from Mr. Maddox that some of them exhausted their limited savings. It is alleged that Mr. Ulysse was the leader and organizer of this scheme to defraud, and two of his Co-Defendants have pled guilty.

I look at the weight of the evidence. I am not surprised. It is a -- in a Federal case, that the weight of the evidence may be fairly strong. That is typical. This factor doesn't particularly move me. But I do have to consider the weight of the evidence, which includes incriminating text messages, cell site location, and travel records, among other things. Oh, and I note that there were 70 elders who were apparently defrauded in this scheme.

So, on the --- of fraud schemes in Federal Court, I call this a fairly significant one. I also have to consider the other proffer of the Government, regarding various other

issues. For instance, during a search of your home, Mr. Ulysse, apparently the police did recover a stolen firearm registered to someone here in Baltimore. Now, I have no idea of whether or not they will be able to link that firearm to you, but that is the proffer that I have before me.

In addition to that, the seizure in December of 2020, in a rental car not registered in your name, of lots of money and personal identifying information, and the fact that this occurred within several months, if not a year, of the other scheme -- fraud scheme ending -- that is concerning, too. That shows me an apparent pattern of some sort of behavior of fraud.

I thought long and hard about the proposed third party custodian, because in my opinion, this case is a close call. And I looked at the pre-trial services report, and I have talked to Ms. Vallandingham about the third party custodian and -- I mean, it is just absolutely heartbreaking. Ms. Ulysse and Ms. Woodward's son's medical condition.

I mean, it is sort of unspeakable, and I am just very, very sorry about that. I can't, however, conflate the sympathy I have for him and for his -- the child's mother with whether or not it is a suitable place for him to live. And so, as I look at the pre-trial services report, I am just curious.

Mr. Bardos talked about the connection between him and his son, and I am sure there is a strong one, but I have a pre-trial services report in which it says he has only seen his son -- the mother of the son for -- a few times in the last five years, and that he does not provide for his son financially.

Ms. Woodward, apparently, does not know what Mr. Ulysse does for a job. They haven't had much connection in the past five years. I see he is raising his hand. I am sure he wants to tell me he did contribute financially. So, I am not going consider that. I will let you talk to Mr. Bardos. Okay, Mr. Ulysse? That is fair. That is absolutely fair. Just give me one moment. Okay? All right.

So, setting that aside, whether or not he contributed financially, or how often he has seen him, the dynamic of the relationship, to me, doesn't give me confidence that she would be a suitable third party custodian, mostly because she is devoted solely to caring for her very disabled son right now.

I also take in consideration of the Government has offered, for this apparent dispute that happened in 2018 between the two of them. I will let Mr. Ulysse talk to Mr. Bardos, just to see if I have got any of my facts wrong before I make my final ruling. But, do you want to go into a breakout room? Mr. Purnell, is that possible?

THE CLERK: Yes. Just give me one second. I am trying to unmute them. It kind of -- it takes awhile --

THE COURT: All right, thank you.

THE CLERK: -- on mute, sometimes.

(Pause)

THE COURT: All right. Mr. Purnell, can you nudge the out of the room? We have got the other hearings.

THE CLERK: Okay --

THE COURT: Okay?

THE DEFENDANT: -- they're holding me.

MR. BARDOS: I understand.

THE CLERK: Hey, Mr. Bardos?

MR. BARDOS: ---.

THE DEFENDANT: And then, after all -- everybody -- is everybody else.

THE COURT: Okay. Mr. Bardos, have you had a chance to talk to your client?

MR. BARDOS: Yes. Thank you, Your Honor. I don't know if -- I mean, I wasn't there when pre-trial talked to Ms. Woodard. I have spoke to Ms. Woodard. She says that Mr. Ulysse --- there as frequently as he can be, and that when he is there, he spends the entire time taking care of his son. He stays in the room with his son, he takes care of his son.

He is a very good father. And even when he is not

there, they -- he still will call them on a regular basis. So, I understand the Court has some concerns about Ms. Woodard as a third party custodian. I can tell the Court that I also spoke with the Defendant's mother, who would be willing to be a third party custodian.

I didn't present her because I thought it made more sense -- she lives in New York. It made more sense for him to stay in Maryland. If that becomes an issue, I can present other third party custodians, if that is what the Court ---. But I just wanted to let you know he is a --- father to his son, and he does him regularly, and he takes care of him when he is there.

THE COURT: Well, I appreciate that clarification and I -- it is heartening and encouraging to hear he is a good father. I have no reason to doubt that, because of course, his son needs that. I guess, the bigger picture is, my ruling doesn't rest entirely on the suitability of third party custodian.

My rulings rests largely on a constellation of reasons the Government has identified, which I went over. And I don't even think I mentioned the fact of this concerning prior conviction of profiting from prostitution of a minor, which it is, in some ways -- frankly, might be worse than a kidnaping charge, given the allegations here, which involve profiting an elderly person.

And so, there is just a pattern here that I am very uncomfortable with, and that does not give me confidence that Mr. Ulysse would abide by any release conditions that I impose. So, for that reason, I am entering an order of detention. Should we do an arraignment today?

MR. BARDOS: Your Honor, I don't believe Mr. Ulysse has even seen the indictment. So --

THE COURT: Then we shouldn't do an arraignment. Okay. Has there been a Rule 5(f) advisement, Mr. Maddox?

MR. MADDOX: I don't specifically recall whether or not Judge Copperthite did that.

THE COURT: All right. Well, let me do it, out of an abundance of caution. As required by Rule 5(f), the United States is ordered to produce all exculpatory evidence to the Defendant, pursuant to Brady against Maryland and its progeny. Not doing so in a timely manner may result in sanctions, including exclusion of evidence, adverse jury instructions, dismissal of charges, contempt proceedings, vacating a conviction, or disciplinary action against the prosecution.

Mr. Maddox, was there anything else that we can address today, from your perspective?

MR. MADDOX: No, Your Honor. Thank you for your time. I know it has been a busy day.

THE COURT: Oh, thank you. Mr. Bardos, anything

from your perspective?

MR. BARDOS: No. Thank you, Your Honor. And congratulations.

THE COURT: Thank you. Mr. Ulysse, good luck to you, sir. We are in recess.

THE CLERK: This Honorable Court now stands in recess to this matter.

(Whereupon, at 2:55 p.m., the proceedings were concluded.)

C E R T I F I C A T E

I certify that the foregoing is correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

Brenda Khan 6/28/2021
Brenda Khan Date
Transcriber, CompuScribe